23126

described property located in the

COUNTY of SAN DIEGO
[Type of Recording Jurisdiction] [(Name of Recording Jurisdiction]

PARCEL 1 OF PARCEL MAP NO 9820 IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, MARCH 20, 1980 AS INSTRUMENT NO.80-029074 OF OFFICIAL RECORDS.
APN: 348-660-57-00

which currently has the address of 4346 BENHURST AVE

RECORDING REQUESTED BY
COMMONWEALTH LAND TITLE COMPANY

23124

DOC # 2005-0306924

After Recording Return To:
PFF BANK & TRUST
9467 MILLIKEN AVE
P.O. BOX 2729
RANCHO CUCAMONGA, CA 91729-2729
LOAN CLOSING DEPARTMENT
ATTN: KAREN HARRELL

APR 13, 2005 4:57 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES: 69.00
PAGES: 21 DA: 1

2005-0306924

[Space Above This Line For Recording Data]

# DEED OF TRUST

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated APRIL 01, 2005, together with all Riders to this document.
**(B) "Borrower"** is GEORGE ARVANITIS AND KAREN M ARVANITIS, HUSBAND AND WIFE

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is PFF BANK & TRUST.
Lender is a CORPORATION organized and existing under the laws of THE UNITED STATES. Lender's address is 9467 MILLIKEN AVE, P.O. BOX 2729 RANCHO CUCAMONGA, CA 91729-2729. Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is POMONA FINANCIAL SERVICE, INC.
**(E) "Note"** means the promissory note signed by Borrower and dated APRIL 01, 2005. The Note states that Borrower owes Lender SEVEN HUNDRED THIRTY-FIVE THOUSAND AND NO/100 Dollars (U.S. $ 735,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MAY 01, 2035

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- ☒ Adjustable Rate Rider
- ☐ Condominium Rider
- ☐ Second Home Rider
- ☐ Balloon Rider
- ☐ Planned Unit Development Rider
- ☒ Other(s) [specify] Rider to Note and Deed of Trust
- ☐ 1-4 Family Rider
- ☐ Biweekly Payment Rider

Exhibit B



(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) **"Community Association Dues, Fees and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) **"Escrow Items"** mean those items that are described in Section 3.
(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following





described property located in the

COUNTY of SAN DIEGO
[Type of Recording Jurisdiction] [(Name of Recording Jurisdiction]

PARCEL 1 OF PARCEL MAP NO 9820 IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, MARCH 20, 1980 AS INSTRUMENT NO.80-029074 OF OFFICIAL RECORDS.
APN: 348-660-57-00

which currently has the address of 4346 BENHURST AVE
[Street]
SAN DIEGO, California 92122 ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to



Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.



If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the Holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless

Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from

the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has–if any–with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the



work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in

  23133 

amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations





of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there


23135

is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup .

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but**

**not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured, and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

  BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

______________________ ______________________ (Seal)
GEORGE ARVANITIS - Borrower

N/A
~~Social Security Number~~

______________________ ______________________ (Seal)
KAREN M ARVANITIS - Borrower

N/A
~~Social Security Number~~

______________________ ______________________ (Seal)
- Borrower

N/A
~~Social Security Number~~

______________________ ______________________ (Seal)
- Borrower

N/A
~~Social Security Number~~

**[Space Below This Line For Acknowledgment]**

23138

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of San Diego } ss.

On April 8, 05 (Date), before me, Stephanie S. Schuck, Notary Public (Name and Title of Officer (e.g., "Jane Doe, Notary Public")), personally appeared George Arvanitis and Karen M. Arvanitis (Name(s) of Signer(s)),

~~☐ personally known to me~~
☑ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) ~~is~~/are subscribed to the within instrument and acknowledged to me that ~~he/she~~/they executed the same in ~~his/her~~/their authorized capacity(ies), and that by ~~his/her~~/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

STEPHANIE S. SCHUCK
Commission # 1323432
Notary Public - California
San Diego County
My Comm. Expires Oct 2, 2005

Place Notary Seal Above

WITNESS my hand and official seal.

Stephanie Schuck
Signature of Notary Public

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: Deed of Trust

Document Date: April 1, 05 Number of Pages: 14

Signer(s) Other Than Named Above: N/A

**Capacity(ies) Claimed by Signer**

Signer's Name: ______

☐ Individual
☐ Corporate Officer — Title(s): ______
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: ______

Signer Is Representing: ______

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

© 1997 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 Prod. No. 5907 Reorder: Call Toll-Free 1-800-876-6827

231

PFF BANK & TRUST

# RIDER TO NOTE AND DEED OF TRUST

PFF Loan No. .'02_ _ : _ _ Date: APRIL 01, 2005

FOR VALUE RECEIVED, the undersigned ("Borrower") agree(s) that the following provisions shall be incorporated into the Deed of Trust and Adjustable Rate Rider of even date to which this Rider is attached (hereinafter collectively called the "Deed of Trust") as well as the Adjustable Rate Note which said Deed of Trust secures (hereinafter the "Note"). So long as this Rider shall remain in effect, to the extent that its provisions are inconsistent with the provisions of the Deed of Trust or Note, the provisions of this Rider shall prevail and shall supersede any such inconsistent provisions. During such time that the Deed of Trust or Note, or any part of the indebtedness evidenced by the Note are held by the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association or the Government National Mortgage Association, or their successors, the provisions of this Rider shall be suspended and be of no force or effect. PFF Bank & Trust ("PFF")(Lender) makes no representation that it will attempt to assign, transfer or sell said Note or Deed of Trust and is under no obligation to do so.

1. **Transfer of the Property or a Beneficial Interest in Borrower.**
The second to last sentence of paragraph 18 of the Deed of Trust as amended by the Adjustable Note Rider and as said sentence is set forth in the Note, is amended to read as follows:
"The notice shall provide a period within which Borrower must pay all sums secured by this Security Instrument."
Further, the following related language, appearing as the last sentence of paragraph 7(C) of Note, is deleted in its entirety: "That date must be at least 30 days after the date on which the notice is delivered or mailed to me."

2. **Acceleration; Remedies.**
Paragraph 22 of the Deed of Trust is amended by deleting certain language which appears in (c) of the second sentence of paragraph 22. The language hereby deleted from (c) reads as follows:" . . ., not less than 30 days from the date the notice is given to Borrower."

3. **Reconveyance**
The second sentence of paragraph 23 of the Deed of Trust is amended in its entirety to read as follows: "Trustee shall reconvey the Property without warranty and with reasonable charge to the person or persons legally entitled to it." The following language is added at the end of Section 23: "Trustee shall reconvey the property without warranty."

4. **Limits on Interest Rate Changes.**
The last sentence of Section 4(D) of the Note and Adjustable Rate Rider is amended to read as follows: "My interest rate will never be greater than 11.875 % nor will my interest rate ever be less than 2.750%."

5. **Late Charges for Overdue Payments.**
The provisions of the Note relating to the amount of the late charge are modified and amended by the following: "If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment."

6. **Interest on Indebtedness**
In the event that payments of principal, interest and other fees and charges are not made when due and Lender is prevented from enforcing the obligation to make such payments by foreclosing on the security property or through other appropriate means due to a Bankruptcy petition or similar debtor relief action filed by or against Borrower, then, in addition to all other sums due under the Note and the Deed of Trust, Lender shall be entitled to receive interest on all such delinquent pre-petition payments that are not immediately repaid. Such interest on pre-petition delinquent payments shall be at a market rate agreed to by the appropriate Court, but in no event less than ten percent (10%) per annum, and shall be earned during the entire time that Lender's enforcement of its security interest is forestalled by the Bankruptcy or other debtor relief action.

2159-1
PF31 5/01 9184



23( 0

**7. Borrower's Right to Prepay - Prepayment Charge.**

[NA] The following is applicable only if this box is checked.

The first sentence of the second paragraph of Section 5 of the Note is deleted and replaced by the following: "I may make a full prepayment or partial prepayments which may incur a prepayment charge as set forth herein."

The following language is added at the end of Section 5 of the Note: "If I make any prepayments within 60 months from the first payment due date under the terms of my Promissory Note (The "Note"), and if any prepayment when added to all the prepayments made in the preceding 12-month period, exceeds 20% of the original principal amount of the Note (the "excess prepayment") I shall immediately pay the Note holder a prepayment charge. The prepayment charge will be equal to six (6) months' advance interest if the excess prepayment occurs during the first through the twelfth month of the loan, equal to four (4) months' advance interest if the excess prepayment occurs during the thirteenth through the thirty-sixth month of the loan and equal to three (3) months' advance interest if the excess prepayment occurs during the thirty-seventh through the sixtieth month of the loan. The prepayment charge is payable on the excess prepayment. Therefore, the conditions under which I may make a prepayment without a prepayment charge are : (I) when the prepayment is made after 60 months from my first payment due date; or (II) When the prepayments added to all other prepayments made in the preceding 12-month period, does not exceed 20% of the original principal amount of the Note." The interest rate that will be used to calculate the amount of any prepayment charge is NA %.

IN WITNESS WHEREOF, Borrower has executed this Rider to Note and Deed of Trust.

GEORGE ARVANITIS

KAREN M ARVANITIS

# FIXED/ADJUSTABLE RATE RI[illegible]
## (One-Year Treasury Index-Rate C[illegible])

23141

THIS FIXED/ADJUSTABLE RATE RIDER is made this 1st day of APRIL , 2005 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to

PFF BANK & TRUST

("Lender") of the same date and covering the property described in the Security Instrument and located at:

4346 BENHURST AVE, SAN DIEGO, CA 92122
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial fixed interest rate of 5.875%. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of MAY , 2015 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 75/100 percentage points ( 2.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 7.875 % or less than 3.875%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than TWO percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.875 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold is transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notiee is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_______________ (Seal)
-Borrower
GEORGE ARVANITIS

_______________ (Seal)
-Borrower
KAREN M ARVANITIS

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

File No: 04850721

# EXHIBIT "A"

All that certain real property situated in the County of San Diego, State of California, described as follows:

Parcel 1 of Parcel Map No. 9820, in the City of San Diego, County of San Diego, State of California, filed in the Office of the County Recorder of San Diego County, March 20, 1980 as Instrument No. 80-029074 of Official Records.

EXCEPT therefrom all oil, gas, minerals, and other hydrocarbon substances lying below the surface of said land, but with no right of surface entry, as provided in deeds of record.

EXECUTION VERSION

# SHARED-LOSS AGREEMENT

This Shared-Loss Agreement ("Agreement") is made and entered into as of April 20, 2009, by and between the Federal Deposit Insurance Corporation as Receiver for PFF Bank & Trust, Pomona, California ("Receiver"), and U.S. Bank National Association ("Buyer"). The terms hereof shall modify and supplement, as necessary, the terms of the Loan Sale Agreement between the Receiver and Buyer of even date herewith (the "LSA"), to which this Agreement is attached as an Exhibit. To the extent any inconsistencies may arise between the terms of the LSA and this Agreement with respect to the subject matter of this Agreement, the terms of this Agreement shall control. References in this Agreement to a particular Section shall be deemed to refer to a Section in this Agreement, unless the context indicates that it is intended to be a reference to a Section of the LSA.

## ARTICLE I

## DEFINITIONS

The capitalized terms set forth below, as used in this Agreement, shall have the following meanings. Capitalized terms that are not otherwise defined herein are used as defined in the LSA.

"**Accounting Records**" means the subsidiary system of record on which the loan history and balance of each Shared-Loss Loan is maintained; individual loan files containing either an original or copies of documents that are customary and reasonable with respect to loan servicing, including management and disposition of Other Real Estate; the records documenting alternatives considered with respect to loans in default or for which a default is reasonably foreseeable; records of loss calculations and supporting documentation with respect to line items on the loss calculations; and monthly delinquency reports and other performance reports customarily utilized by the Buyer in management of loan portfolios.

"**Accrued Interest**" means, with respect to Shared-Loss Loans, the amount of earned and unpaid interest at the note rate specified in the applicable loan documents, limited to 90 days.

"**Commencement Date**" means the first calendar day following the Bank Closing Date.

"**Cumulative Loss Amount**" means the sum of the Monthly Loss Amounts less the sum of all Recovery Amounts under this Agreement, plus the cumulative Charge-Offs (net of Type A Recoveries) plus the cumulative Type A Reimbursable Expenses under the PFF Shared-Loss Agreement for commercial loans (as such terms are defined in such agreement).

"**Cumulative Shared-Loss Amount**" means the excess, if any, of the Cumulative Loss Amount over the First Loss Amount.

"**Customary Servicing Procedures**" means procedures (including collection procedures) that the Buyer customarily employs and exercises in servicing and administering mortgage loans for its own accounts and the servicing procedures established by FNMA or FHLMC, which are in accordance with accepted mortgage servicing practices of prudent lending institutions.

"**Final Shared-Loss Month**" means the calendar month in which the tenth anniversary of the Commencement Date occurs.

"**First Loss Amount**" means $92,899,000.00.

"**Foreclosure Loss**" means the loss realized when the Buyer has completed the foreclosure on a Shared-Loss Loan and realized final recovery on the collateral through liquidation and recovery of all insurance proceeds. Each Foreclosure Loss shall be calculated in accordance with the form and methodology specified in Exhibit 2a.

"**Loss**" means a Foreclosure Loss, Restructuring Loss, Short-Sale Loss, or Portfolio Loss.

"**Monthly Certificate**" has the meaning provided in Section 2.1(b) of this Agreement.

"**Monthly Loss Amount**" means the sum of all Foreclosure Losses, Restructuring Losses, Short Sale Losses and Portfolio Losses realized by the Buyer for any Shared-Loss Month.

"**Monthly Shared-Loss Amount**" means the change in the Cumulative Shared-Loss Amount from the beginning of each Shared-Loss Month to the end of each such month.

"**Portfolio Loss**" means the loss realized on the Portfolio Sale of the remaining Shared-Loss Loans in accordance with the terms of Article IV.

"**Recovery Amount**" means, with respect to any period prior to the Termination Date, the amount of collected funds received by the Buyer that (i) are applicable against a Foreclosure Loss which has previously been paid to the Buyer by the Receiver or (ii) are gains realized from a Section 4.1 or Section 4.2 sale of Shared-Loss Loans for which the Buyer has previously received a Restructuring Loss payment from the Receiver.

"**Restructuring Loss**" means the loss on a modified or restructured loan measured by the difference between (a) the principal, Accrued Interest, tax and insurance advances and third party fees due on a loan prior to the modification or restructuring, and (b) the net present value of estimated cash flows on the modified or restructured loan, discounted at the Then-Current Interest Rate. Each Restructuring Loss shall be calculated in accordance with the form and methodology attached as Exhibit 2b and Exhibit 5.

"**Restructured Loan**" means a Shared-Loss Loan for which the Buyer has received a Restructuring Loss payment from the Receiver.

"**Servicing Officer**" has the meaning provided in Section 2.1(b) of this Agreement.

"**Shared-Loss Loans**" means the Loans in Loan Pools identified on the Schedule of Loans set forth in Attachment A to the LSA.

"**Shared-Loss Month**" means each calendar month between the Commencement Date and the last day of the month in which the tenth anniversary of the Commencement Date occurs, provided that, the first Shared-Loss Month shall begin on the Commencement Date and end on the last day of that month.

"**Short Sale Loss**" means the loss resulting from the Buyer's agreement with the mortgagor to accept a payoff in an amount less than the balance due on the loan, provided that each Short Sale Loss shall be calculated in accordance with the form and methodology specified in Exhibit 2c.

"**Stated Threshold**" means the combined total of loss payments by the Receiver to the Buyer under this Agreement and the PFF Shared-Loss Agreement for commercial loans in the amount of $500,000,000.

"**Termination Date**" means the last day of the Final Shared-Loss Month.

"**Then-Current Interest Rate**" means the most recently published Freddie Mac survey rate for 30-year fixed-rate loans.

## ARTICLE II

## SHARED-LOSS ARRANGEMENT

**2.1 Shared-Loss Arrangement.**

(a) **Loss Mitigation and Consideration of Alternatives.** For each Shared-Loss Loan in default or for which a default is reasonably foreseeable, the Buyer shall undertake reasonable and customary loss mitigation efforts. The Buyer shall document its consideration of foreclosure, loan restructuring, and short-sale (if short-sale is a viable option) alternatives and shall select the alternative resulting in the least Loss. Buyer shall retain its calculations of the estimated loss under each alternative, such calculations to be provided to the Receiver upon request.

(b) **Monthly Certificates.**

Not later than fifteen (15) days after the end of each Shared-Loss Month (except as provided below), beginning with the month in which the Commencement Date occurs and ending in the month in which the tenth anniversary of the Commencement Date occurs, the Buyer shall deliver to the Receiver a certificate, signed by an officer of the Buyer involved in, or responsible for, the administration and servicing of the Shared-Loss Loans whose name appears on a list of servicing officers furnished by the Buyer to the Receiver, (a "Servicing Officer")

setting forth in such form in and detail as the Receiver may reasonably specify (a "Monthly Certificate"):

(A) a schedule substantially in the form of Exhibit 1 listing:

(i) each Shared-Loss Loan for which a "Loss Amount" (calculated in accordance with the applicable Exhibit) is being claimed during such Shared-Loss Month, the related Loss Amount for each such Shared-Loss Loan, and the total Monthly Loss Amount for all such Shared-Loss Loans;

(ii) each Shared-Loss Loan for which a Recovery Amount was received during such Shared-Loss Month, the related Recovery Amount for each such Shared-Loss Loan, and the total Recovery Amount for all such Shared-Loss Loans;

(iii) the total Monthly Loss Amount for all Shared-Loss Loans described in clause (i) above minus the total monthly Recovery Amount for all Shared-Loss Loans described in clause (ii) above;

(iv) the Cumulative Shared-Loss Amount as of the beginning and end of such Shared-Loss Month;

(v) the Monthly Shared-Loss Amount;

(vi) the result obtained in (v) times 80%, or times 95% if the Stated Threshold has been met, which in either case is the amount to be paid under Section 2.1(d) of this Agreement by the Receiver to the Buyer if the amount is a positive number, or by the Buyer to the Receiver if the amount is a negative number.

(B) for each of the Shared-Loss Loans for which a Loss is claimed for that Shared-Loss Month, a schedule showing the calculation of the Loss Amount using the form and methodology shown in Exhibit 2a, Exhibit 2b, or Exhibit 2c, as applicable.

(C) For each of the Restructured Loans where a gain or loss is realized in a sale under Section 4.1 or 4.2, a schedule showing the calculation using the form and methodology shown in Exhibit 2d.

(D) a portfolio performance and summary schedule substantially in the form shown in Exhibit 3.

The Monthly Certificate for each of the first Shared-Loss Month and second Shared-Loss Month shall be delivered on the due date for the Monthly Certificate for the third Shared-Loss Month.

(c) **Monthly Data Download.** Not later than fifteen (15) days after the end of each Shared-Loss Month (except as provided below), Buyer shall provide Receiver:

(i) the servicing file in machine-readable format including but not limited to the following fields for each outstanding Shared-Loss Loan, as applicable:

(A) Loan number
(B) FICO score
(C) Origination date
(D) Original principal amount
(E) Maturity date
(F) Paid-to date
(G) Last payment date
(H) Loan status (bankruptcy, in foreclosure, etc.)
(I) Delinquency counters
(J) Current principal balance
(K) Current escrow account balance
(L) Current Appraisal/BPO value
(M) Current Appraisal/BPO date
(N) Interest rate
(O) Monthly principal and interest payment amount
(P) Monthly escrow payment for taxes and insurance
(Q) Interest rate type (fixed or adjustable)
(R) If adjustable: index, margin, next interest rate reset date
(S) Payment/Interest rate cap and/or floor
(T) Underwriting type (Full doc, Alt Doc, No Doc)
(U) Lien type (1st, 2nd,)
(V) Amortization type (amortizing or I/O)
(W) Property address, including city, state, zip code
(X) A code indicating whether the Mortgaged Property is owner-occupied
(Y) Property type (single-family detached, condominium, duplex, etc.)

(ii) An Excel file for ORE held as a result of foreclosure on a Shared-Loss Loan listing:

(A) Foreclosure date
(B) Unpaid loan principal balance
(C) Appraised value or BPO value, as applicable
(D) Projected liquidation date

The information required by this Section 2.1(c) for each of the first Shared-Loss Month and second Shared-Loss Month shall be delivered on the due date for the information required to be delivered for the third Shared-Loss Month.

(d) **Payments With Respect to Shared-Loss Assets.**

(i) **Losses Under the Stated Threshold.** Not later than fifteen (15) days after the date on which the Receiver receives the Monthly Certificate, the Receiver shall pay to the Buyer, in immediately available funds, an amount equal to eighty percent (80%) of the Monthly Shared-Loss Amount reported on the Monthly Certificate. If the total Monthly Shared-Loss Amount reported on the Monthly Certificate is a negative number, the Buyer shall pay to the Receiver in immediately available funds eighty percent (80%) of that amount concurrently with its delivery of such Monthly Certificate.

(ii) **Losses in Excess of the Stated Threshold.** In the event that that the Stated Threshold has been met, the loss/recovery sharing percentages shall change from 80/20 to 95/5 and thereafter the Receiver shall pay to the Buyer, in immediately available funds, an amount equal to ninety-five percent (95%) of the Monthly Shared-Loss Amount reported on the Monthly Certificate not later than fifteen (15) days after the date on which the Receiver receives such Monthly Certificate. If the Monthly Shared-Loss Amount reported on the Monthly Certificate is a negative number, the Buyer shall pay to the Receiver in immediately available funds ninety-five percent (95%) of that amount concurrently with its delivery of such Monthly Certificate.

(e) **Limitations on Shared-Loss Payment.** The Receiver shall not be required to make any payments pursuant to Section 2.1(d) with respect to any Foreclosure Loss, Restructuring Loss, Short Sale Loss or Portfolio Loss that the Receiver determines, based upon the criteria set forth in this Agreement (including the analysis and documentation requirements of Section 2.1(a)) or Customary Servicing Procedures, should not have been effected by the Buyer. In the event that the Receiver does not make any payment with respect to Losses claimed pursuant to Section 2.1(d), the Receiver and Buyer shall make the necessary adjustments to the Monthly Shared-Loss Amount for that Monthly Certificate and the payment pursuant to Section 2.1(d) above shall be adjusted accordingly.

(f) **Payments by Wire-Transfer.** All payments under this Agreement shall be made by wire-transfer in accordance with the wire-transfer instructions on Exhibit 4.

**2.2 Auditor Report; Right to Audit.**

(a) Within ninety (90) days after the end of each calendar year during which the Receiver makes any payment to the Buyer under this Agreement, the Buyer shall deliver to the Receiver a report signed by its independent public accountants stating that they have reviewed the terms of this Agreement and that, in the course of their annual audit of the Buyer's

books and records, nothing has come to their attention suggesting that any computations required to be made by the Buyer during such calendar year pursuant to this Article II were not made by the Buyer in accordance herewith. In the event that the Buyer cannot comply with the preceding sentence, it shall promptly submit to the Receiver corrected computations together with a report signed by its independent public accountants stating that, after giving effect to such corrected computations, nothing has come to their attention suggesting that any computations required to be made by the Buyer during such year pursuant to this Article II were not made by the Buyer in accordance herewith. In such event, the Buyer and the Receiver shall make all such accounting adjustments and payments as may be necessary to give effect to each correction reflected in such corrected computations, retroactive to the date on which the corresponding incorrect computation was made.

(b)     The Receiver or the FDIC in its corporate capacity ("Corporation") may perform an audit or audits to determine the Buyer's compliance with the provisions of this Agreement, including this Article II, by providing not less than ten (10) Business Days' prior written notice. Buyer shall provide access to pertinent records and proximate working space in Buyer's facilities. The scope and duration of any such audit shall be within the sole discretion of the Receiver or the Corporation. The Receiver or the Corporation, as the case may be, shall bear the expense of any such audit. In the event that any corrections are necessary as a result of such an audit or audits, the Buyer and the Receiver shall make such accounting adjustments and payments as may be necessary to give retroactive effect to such corrections.

**2.3     Withholdings.** Notwithstanding any other provision in this Article II, the Receiver, upon the direction of the Director (or designee) of the Federal Deposit Insurance Corporation's Division of Resolutions and Receiverships, may withhold payment for any amounts included in a Monthly Certificate delivered pursuant to Section 2.1, if there is a reasonable basis for denying the eligibility of an item for which reimbursement or payment is sought under such Section. In such event, the Receiver shall provide a written notice to the Buyer detailing the grounds for withholding such payment. At such time as the Buyer demonstrates to the satisfaction of the Receiver, in its reasonable judgment, that the grounds for such withholding of payment, or portion of payment, no longer exist or have been cured, then the Receiver shall pay the Buyer the amount withheld which the Receiver determines is eligible for payment, within fifteen (15) Business Days.

**2.4     Books and Records.** The Buyer shall at all times keep books and records sufficient to ensure and document compliance with the terms of this Agreement, including but not limited to (a) documentation of alternatives considered with respect to defaulted loans or loans for which default is reasonably foreseeable, (b) documentation showing the calculation of Loss for claims submitted to the Receiver, (c) retention of documents that support each line item on the loss claim forms, and (d) documentation with respect to the Recovery Amount on loans for which the Receiver has made a shared-loss payment.

**2.5     Information.** The Buyer shall promptly provide to the Receiver such other information, including but not limited to, financial statements, computations, and bank policies and procedures, relating to the performance of the provisions of this Agreement, as the Receiver may reasonably request from time to time.

**2.6** **Tax Ruling.** The Buyer shall not at any time, without the Receiver's prior written consent, seek a private letter ruling or other determination from the Internal Revenue Service or otherwise seek to qualify for any special tax treatment or benefits associated with any payments made by the Receiver pursuant to this Agreement.

**2.7** **Sale of Shared-Loss Loans.** The Receiver shall be relieved of its obligations with respect to a Shared-Loss Loan upon payment of a Foreclosure Loss amount or a Short Sale Loss amount with respect to such Shared-Loss Loan or upon the sale of a Shared-Loss Loan by Buyer to an unaffiliated person or entity. The Buyer shall provide the Receiver with timely notice of any such sale. Notwithstanding the foregoing, a sale of the Shared-Loss Loan, for purposes of this Section 2.7, shall not be deemed to have occurred as the result of (i) any change in the ownership or control of Buyer, (ii) a merger by Buyer with or into any other entity, or (iii) a sale by Buyer of all or substantially all of its assets.

## ARTICLE III

## RULES REGARDING THE ADMINISTRATION OF SHARED-LOSS LOANS

**3.1** **Agreement with Respect to Administration.** The Buyer shall (and shall cause any of its Affiliates to which the Buyer transfers any Shared-Loss Loans to) manage, administer, and collect the Shared-Loss Loans while owned by the Buyer or any Affiliate thereof during the term of this Agreement in accordance with the rules set forth in this Article III. The Buyer shall be responsible to the Receiver in the performance of its duties hereunder and shall provide to the Receiver such reports as the Receiver reasonably deems advisable, including but not limited to the reports required by Sections 2.1, 2.2 and 3.3 hereof, and shall permit the Receiver to monitor the Buyer's performance of its duties hereunder.

**3.2** **Duties of the Buyer.** (a) In performance of its duties under this Article III, the Buyer shall:

(i) manage and administer each Shared-Loss Loan in accordance with Buyer's usual and prudent business and banking practices and Customary Servicing Procedures;

(ii) exercise its prudent business judgment in managing, administering and collecting amounts owed on the Shared-Loss Loans;

(iii) use commercially reasonable efforts to maximize collections with respect to Losses on Shared-Loss Loans without regard to the effect of maximizing collections on assets held by the Buyer or any of its Affiliates that are not Shared-Loss Loans;

(iv) retain sufficient staff to perform its duties hereunder; and

              (v) comply with the terms of Exhibit 5 attached hereto, the FDIC Loan Modification Program, for any Shared-Loss Loans meeting the definition of Qualifying Loans set forth therein. The Buyer may propose exceptions to Exhibit 5 for a group of Loans with similar characteristics, with the objectives of (1) minimizing the Loss to the Buyer and the FDIC and (2) maximizing the opportunity for qualified homeowners to remain in their homes with affordable mortgage payments.

(b) Any transaction with or between any Affiliate of the Buyer with respect to any Shared-Loss Loan including, without limitation, the execution of any contract pursuant to which any Affiliate of the Buyer will manage, administer or collect any of the Shared-Loss Loans shall be subject to the prior written approval of the Receiver.

**3.3 Shared-Loss Loans Records and Reports.** The Buyer shall establish and maintain such records as may be appropriate to account for the Shared-Loss Loans in such form and detail as the Receiver may reasonably require, and to enable the Buyer to prepare and deliver to the Receiver such reports as the Receiver may from time to time request regarding the Shared-Loss Loans and the Monthly Certificates required by Section 2.1 of this Agreement.

**3.4 Related Loans.**

(a) Buyer shall use its commercially reasonable efforts to determine which loans are "Related Loans", as hereinafter defined. The Buyer shall not manage, administer or collect any "Related Loan" in any manner that would have the effect of increasing the amount of any collections with respect to the Related Loan to the detriment of the Shared-Loss Loan to which such loan is related. A "Related Loan" means any loan or extension of credit held by the Buyer at any time on or prior to the end of the Final Shared-Loss Month that is made to an obligor of a Shared-Loss Loan.

(b) The Buyer shall prepare and deliver to the Receiver with the Monthly Certificates for the calendar months ending June 30 and December 31, a schedule of all Related Loans on the Accounting Records of the Buyer as of the end of each such semi-annual period.

**3.5 Legal Action; Utilization of Special Receivership Powers.** The Buyer shall notify the Receiver in writing (such notice to be given in accordance with Article V below and to include all relevant details) prior to utilizing in any legal action any special legal power or right which the Buyer derives as a result of having acquired an asset from the Receiver, and the Buyer shall not utilize any such power unless the Receiver shall have consented in writing to the proposed usage. The Receiver shall have the right to direct such proposed usage by the Buyer and the Buyer shall comply in all respects with such direction. Upon request of the Receiver, the Buyer will advise the Receiver as to the status of any such legal action. The Buyer shall immediately notify the Receiver of any judgment in litigation involving any of the aforesaid special powers or rights.

## ARTICLE IV

## PORTFOLIO SALE

4.1 **Buyer Portfolio Sale of Remaining Shared-Loss Loans.** The Buyer shall have the right with the concurrence of the Receiver to liquidate for cash consideration, all Shared-Loss Loans held by the Buyer at any time prior to the Termination Date ("Portfolio Sale"). If the Buyer exercises its option under this Section 4.1, it must give thirty (30) days notice in writing to the Receiver setting forth the details and schedule for the Portfolio Sale which shall be conducted by means of sealed bid sales to third parties, not including any of the Buyer's affiliates, contractors, or any affiliates of the Buyer's contractors. Sales of Restructured Loans shall be sold in a separate pool from Shared-Loss Loans not restructured. The Receiver's review of the Buyer's proposed Portfolio Sale will be considered in a timely fashion and approval will not be unreasonably withheld, delayed or conditioned.

4.2 **Buyer Liquidation of Remaining Shared-Loss Loans.** In the event that the Buyer does not conduct a Portfolio Sale pursuant to Section 4.1, the Receiver shall have the right, exercisable in its sole and absolute discretion, to require the Buyer to liquidate for cash consideration, any Shared-Loss Loans held by the Buyer at any time after the date that is six months prior to the Termination Date. If the Receiver exercises its option under this Section 4.2, it must give notice in writing to the Buyer, setting forth the time period within which the Buyer shall be required to liquidate the Shared-Loss Loans. The Buyer will comply with the Receiver's notice and must liquidate the Shared-Loss Loans as soon as reasonably practicable by means of sealed bid sales to third parties, not including any of the Buyer's affiliates, contractors, or any affiliates of the Buyer's contractors. The selection of any financial advisor or other third party broker or sales agent retained for the liquidation of the remaining Shared-Loss Loans pursuant to this Section shall be subject to the prior approval of the Receiver, such approval not to be unreasonably withheld, delayed or conditioned.

4.3 **Calculation of Sale Gain or Loss.** For Shared-Loss Loans that are not Restructured Loans, gain or loss on the sales under Section 4.1 or Section 4.2 will be calculated as the sale price received by the Buyer less the unpaid principal balance of the remaining Shared-Loss Loans. For any Restructured Loan included in the sale, gain or loss on sale will be calculated as (a) the sale price received by the Buyer less (b) the net present value of estimated cash flows on the Restructured Loan that was used in the calculation of the related Restructuring Loss plus (c) Loan principal payments collected by the Buyer from the date the Loan was restructured to the date of sale. (See Exhibit 2d for example calculation.)

## ARTICLE V

## LOSS-SHARING NOTICES GIVEN TO RECEIVER AND BUYER

All notices, demands and other communications hereunder shall be in writing and shall be delivered by hand, or overnight courier, receipt requested, addressed to the parties as follows:

If to Receiver, to: Federal Deposit Insurance Corporation
as Receiver for PFF Bank & Trust, Pomona, CA
Division of Resolutions and Receiverships
550 17th Street, N.W.
Washington, D.C. 20429
Attention: Ralph Malami, Manager, Capital Markets

with a copy to: Federal Deposit Insurance Corporation
as Receiver for PFF Bank & Trust, Pomona, CA
Room E7056
3501 Fairfax Drive
Arlington, VA 22201
Attention: Special Issues Unit

With respect to a notice under Section 3.5 of this Agreement, copies of such notice shall be sent to:

Federal Deposit Insurance Corporation
Legal Division
1910 Pacific Avenue
Dallas, Texas 75201
Attention: Regional Counsel

If to Buyer, to: U.S. Bank National Association
U.S. Bancorp Center
BC-MN-H21N
800 Nicollet Mall
Minneapolis, Minnesota 55402-4302
Attention: Lee R. Mitau

with a copy to: Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Attention: Mitchell S. Eitel

Such Persons and addresses may be changed from time to time by notice given pursuant to the provisions of this Article V. Any notice, demand or other communication delivered pursuant to the provisions of this Article V shall be deemed to have been given on the date actually received.

## ARTICLE VI

## MISCELLANEOUS

6.1 **Expenses.** Except as otherwise expressly provided herein, all costs and expenses incurred by a party hereto in connection with this Agreement shall be borne by such party whether or not the transactions contemplated herein shall be consummated.

6.2 **Successors and Assigns; Specific Performance.** All terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto only; provided, however, that, Receiver may assign or otherwise transfer this Agreement (in whole or in part) to the Federal Deposit Insurance Corporation in its corporate capacity without the consent of Buyer. Notwithstanding anything to the contrary contained in this Agreement, except as is expressly permitted in this Section 6.2, Buyer may not assign or otherwise transfer this Agreement (in whole or in part) without the prior written consent of the Receiver, which consent may be granted or withheld by the Receiver in its sole discretion, and any attempted assignment or transfer in violation of this provision shall be void *ab initio*.

6.3 **Governing Law.** This Agreement shall be construed in accordance with federal law, or, if there is no applicable federal law, the laws of the State of New York, without regard to any rule of conflict of law that would result in the application of the substantive law of any jurisdiction other than the State of New York.

6.4 **WAIVER OF JURY TRIAL.** EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF OR RELATING TO OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

6.5 **Captions.** All captions and headings contained in this Agreement are for convenience of reference only and do not form a part of, and shall not affect the meaning or interpretation of, this Agreement.

6.6 **Entire Agreement; Amendments.** This Agreement, including the Exhibits and any other documents delivered pursuant hereto, embody the entire agreement of the parties with respect to the subject matter hereof, and supersede all prior representations, warranties, offers, acceptances, agreements and understandings, written or oral, relating to the subject matter herein. This Agreement may be amended or modified or any provision thereof waived only by a written instrument signed by both parties or their respective duly authorized agents.

6.7 **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid, illegal or unenforceable under applicable law, such provision shall be construed and enforced as if it had been more narrowly drawn so as not to be prohibited, invalid, illegal or unenforceable, and the validity, legality and enforceability

of the remainder of such provision and the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

**6.8** **No Third Party Beneficiary.** This Agreement and the Exhibits hereto are for the sole and exclusive benefit of the parties hereto and their respective permitted successors and permitted assigns and there shall be no other third party beneficiaries, and nothing in this Agreement or the Exhibits shall be construed to grant to any other Person any right, remedy or claim under or in respect of this Agreement or any provision hereof.

**6.9** **Counterparts.** This Agreement may be executed separately by Receiver and Buyer in any number of counterparts, each of which when executed and delivered shall be an original, but such counterparts shall together constitute one and the same instrument.

**6.10** **Consent.** Except as otherwise provided herein, when the consent of a party is required herein, such consent shall not be unreasonably withheld or delayed.

**6.11** **Rights Cumulative.** Except as otherwise expressly provided herein, the rights of each of the parties under this Agreement are cumulative, may be exercised as often as any party considers appropriate and are in addition to each such party's rights under the LSA and any related agreements or under law. Except as otherwise expressly provided herein, any failure to exercise or any delay in exercising any of such rights, or any partial or defective exercise of such rights, shall not operate as a waiver or variation of that or any other such right.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION as RECEIVER for PFF BANK & TRUST, POMONA, CALIFORNIA

By: ____________________
Name: GARY HOLLOWAY
Title: ATTORNEY IN FACT

U.S. BANK NATIONAL ASSOCIATION

By: ____________________
Name: Terrance R. Dolan
Title: Executive Vice President & Controller

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION as RECEIVER for PFF BANK & TRUST, POMONA, CALIFORNIA

By: ____________________
Name: ____________________
Title: ____________________

U.S. BANK NATIONAL ASSOCIATION

By: ____________________
Name: Terrance R. Dolan
Title: Executive Vice President & Controller

# InterestFirst[SM] ADJUSTABLE RATE NOTE
## (One-Year Treasury Index-Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

APRIL 01 2005 RANCHO CUCAMONGA [City] CALIFORNIA [State]

4346 BENHURST AVE, SAN DIEGO, CA 92122

[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 735,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. The Lender is PFF BANK & TRUST I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.875 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment on the first day of every month, beginning on JUNE 01 , 2005 . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on MAY 01 , 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 9467 MILLIKEN AVE, RANCHO CUCAMONGA, CA 91730 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

My monthly payment will be in the amount of U.S. $ 3,598.44 before the First Principal and Interest Payment Due Date, and therefter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of MAY , 2015 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 75/100 percentage points ( 2.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 7.875 % or less than 3.875 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than TWO percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.875 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include the information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.
>
> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including , but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEALS(S) OF THE UNDERSIGNED.

_______________ (Seal)
GEORGE ARVANITIS -Borrower

Karen M. Arvanitis (Seal)
KAREN M ARVANITIS -Borrower

_______________ (Seal)
-Borrower

*[Sign Original Only]*

PFF BANK & TRUST
**RIDER TO NOTE AND DEED OF TRUST**

PFF Loan No.                                                        Date:    APRIL    01, 2005

FOR VALUE RECEIVED, the undersigned ("Borrower") agree(s) that the following provisions shall be incorporated into the Deed of Trust and Adjustable Rate Rider of even date to which this Rider is attached (hereinafter collectively called the "Deed of Trust") as well as the Adjustable Rate Note which said Deed of Trust secures (hereinafter the "Note"). So long as this Rider shall remain in effect, to the extent that its provisions are inconsistent with the provisions of the Deed of Trust or Note, the provisions of this Rider shall prevail and shall supersede any such inconsistent provisions. During such time that the Deed of Trust or Note, or any part of the indebtedness evidenced by the Note are held by the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association or the Government National Mortgage Association, or their successors, the provisions of this Rider shall be suspended and be of no force or effect. PFF Bank & Trust ("PFF")(Lender) makes no representation that it will attempt to assign, transfer or sell said Note or Deed of Trust and is under no obligation to do so.

1. **Transfer of the Property or a Beneficial Interest in Borrower.**

   The second to last sentence of paragraph 18 of the Deed of Trust as amended by the Adjustable Note Rider and as said sentence is set forth in the Note, is amended to read as follows:

   "The notice shall provide a period within which Borrower must pay all sums secured by this Security Instrument." Further, the following related language, appearing as the last sentence of paragraph 7(C) of Note, is deleted in its entirety: "That date must be at least 30 days after the date on which the notice is delivered or mailed to me."

2. **Acceleration; Remedies.**

   Paragraph 22 of the Deed of Trust is amended by deleting certain language which appears in (c) of the second sentence of paragraph 22. The language hereby deleted from (c) reads as follows:" . . ., not less than 30 days from the date the notice is given to Borrower."

3. **Reconveyance**

   The second sentence of paragraph 23 of the Deed of Trust is amended in its entirety to read as follows: "Trustee shall reconvey the Property without warranty and with reasonable charge to the person or persons legally entitled to it." The following language is added at the end of Section 23: "Trustee shall reconvey the property without warranty."

4. **Limits on Interest Rate Changes.**

   The last sentence of Section 4(D) of the Note and Adjustable Rate Rider is amended to read as follows: "My interest rate will never be greater than        11.875 % nor will my interest rate ever be less than 2.750%."

5. **Late Charges for Overdue Payments.**

   The provisions of the Note relating to the amount of the late charge are modified and amended by the following: "If the Note Holder has not received the full amount of any monthly payment by the end of        15  calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment."

6. **Interest on Indebtedness**

   In the event that payments of principal, interest and other fees and charges are not made when due and Lender is prevented from enforcing the obligation to make such payments by foreclosing on the security property or through other appropriate means due to a Bankruptcy petition or similar debtor relief action filed by or against Borrower, then, in addition to all other sums due under the Note and the Deed of Trust, Lender shall be entitled to receive interest on all such delinquent pre-petition payments that are not immediately repaid. Such interest on pre-petition delinquent payments shall be at a market rate agreed to by the appropriate Court, but in no event less than ten percent (10%) per annum, and shall be earned during the entire time that Lender's enforcement of its security interest is forestalled by the Bankruptcy or other debtor relief action.

 

**7. Borrower's Right to Prepay - Prepayment Charge.**

[NA] The following is applicable only if this box is checked.

The first sentence of the second paragraph of Section 5 of the Note is deleted and replaced by the following: "I may make a full prepayment or partial prepayments which may incur a prepayment charge as set forth herein."

The following language is added at the end of Section 5 of the Note: "If I make any prepayments within 60 months from the first payment due date under the terms of my Promissory Note (The "Note"), and if any prepayment when added to all the prepayments made in the preceding 12-month period, exceeds 20% of the original principal amount of the Note (the "excess prepayment") I shall immediately pay the Note holder a prepayment charge. The prepayment charge will be equal to six (6) months' advance interest if the exeess prepayment occurs during the first through the twelfth month of the loan, equal to four (4) months' advance interest if the excess prepayment occurs during the thirteenth through the thirty-sixth month of the loan and equal to three (3) months' advance interest if the excess prepayment occurs during the thirty-seventh through the sixtieth month of the loan. The prepayment charge is payable on the excess prepayment. Therefore, the conditions under which I may make a prepayment without a prepayment charge are : (I) when the prepayment is made after 60 months from my first payment due date; or (II) When the prepayments added to all other prepayments made in the preceding 12-month period, does not exceed 20% of the original principal amount of the Note." The interest rate that will be used to calculate the amount of any prepayment charge is NA %.

IN WITNESS WHEREOF, Borrower has executed this Rider to Note and Deed of Trust.

GEORGE ARVANITIS

KAREN M ARVANITIS

**FIXED/ADJUSTABLE RATE RID**
**(One-Year Treasury Index-Rate Ca**

THIS FIXED/ADJUSTABLE RATE RIDER is made this 1st day of APRIL , 2005 , , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to

PFF BANK & TRUST

("Lender") of the same date and covering the property described in the Security Instrument and located at:

4346 BENHURST AVE, SAN DIEGO, CA 92122
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial fixed interest rate of 5.875%. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of MAY , 2015 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 75/100 percentage points ( 2.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 7.875 % or less than 3.875%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than TWO percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.875 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold is transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

 

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordanee with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_______________________ (Seal)
GEORGE ARVANITIS -Borrower

Karen M. Arvanitis (Seal)
KAREN M ARVANITIS -Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

B6A (Official Form 6A) (12/07)

In re **George Arvanitis**, Debtor — Case No. ______________

# SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

**Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim." If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| **4346 Benhurst Avenue, San Diego, CA 92122, Lendor U.S. Bank** | **Fee Simple** | **C** | **850,000.00** | **932,000.00** |
| **8310 Regents, La Jolla, CA 92122, Lender U.S. Bank** | **Fee Simple** | **C** | **240,000.00** | **325,000.00** |

Sub-Total > **1,090,000.00** (Total of this page)

Total > **1,090,000.00**

**0** continuation sheets attached to the Schedule of Real Property

(Report also on Summary of Schedules)

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com

Exhibit C

Best Case Bankruptcy

B6D (Official Form 6D) (12/07)

In re **George Arvanitis**, Debtor    Case No. ________

# SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is a creditor, the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor" ,include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H", "W", "J", or "C" in the column labeled "Husband, Wife, Joint, or Community".

If the claim is contingent, place an "X" in the column labeled "Contingent". If the claim is unliquidated, place an "X" in the column labeled "Unliquidated". If the claim is disputed, place an "X" in the column labeled "Disputed". (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion" on the Statistical Summary of Certain Liabilities and Related Data.

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | Husband, Wife, Joint, or Community (H W J C) | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| Account No. xxxxxxxxxx4102<br>**Chase Auto Finance**<br>**PO Box 78101**<br>**Phoenix, AZ 85062-8101** | | - | **2007**<br>**Vehicle Loan**<br>**2006 Mercedes, Model S500**<br>Value $ **28,610.00** | | | | **47,000.00** | **18,390.00** |
| Account No. xxxxx7098<br>**Honda Finance**<br>**P.O. Box 60001**<br>**City Of Industry, CA 91716** | | C | **2008**<br>**Vehicle Loan**<br>**2006 Honda Civic**<br>Value $ **10,435.00** | | | | **9,800.00** | **0.00** |
| Account No. xxxxxx1712<br>**US Bank Home Mortgage**<br>**3121 Michelson Drive**<br>**5th Floor**<br>**Irvine, CA 92612** | | C | **2004**<br>**Deed of Trust**<br>**4346 Benhurst Avenue, San Diego, CA 92122, Lendor U.S. Bank**<br>Value $ **850,000.00** | | | | **735,000.00** | **0.00** |
| Account No. xxxxxx7976<br>**US Bank Home Mortgage**<br>**3121 Michelson Drive**<br>**5th Floor**<br>**Irvine, CA 92612** | | C | **2008**<br>**Deed of Trust**<br>**4346 Benhurst Avenue, San Diego, CA 92122, Lendor U.S. Bank**<br>Value $ **850,000.00** | | | | **197,000.00** | **82,000.00** |
| | | | | | | Subtotal (Total of this page) | **988,800.00** | **100,390.00** |

**1** continuation sheets attached

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com

B6D (Official Form 6D) (12/07) - Cont.

In re **George Arvanitis**, Debtor Case No. ______

# SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions.) | CODEBTOR | Husband, Wife, Joint, or Community (H W J C) | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| Account No. **xxxxxx1716**<br>**US Bank Home Mortgage**<br>**3121 Michelson Drive**<br>**5th Floor**<br>**Irvine, CA 92612** | | **C** | **2007**<br>**Deed of Trust**<br>**8310 Regents, La Jolla, CA 92122, Lender U.S. Bank**<br>Value $ **240,000.00** | | | | **325,000.00** | **85,000.00** |
| Account No. | | | Value $ | | | | | |
| Account No. | | | Value $ | | | | | |
| Account No. | | | Value $ | | | | | |
| Account No. | | | Value $ | | | | | |

Sheet **1** of **1** continuation sheets attached to Schedule of Creditors Holding Secured Claims

| | AMOUNT OF CLAIM | UNSECURED PORTION |
|---|---|---|
| Subtotal (Total of this page) | **325,000.00** | **85,000.00** |
| Total (Report on Summary of Schedules) | **1,313,800.00** | **185,390.00** |

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com Best Case Bankruptcy